## LESS CAR LOAD LOTS CO. et al. v. PENNSYLVANIA R. CO.

District Court, S. D. New York.
May 2, 1935.

Lord, Day & Lord, of New York City (Edwin S. Clarkson, of Washington, D. C.,

and Parker McCollester, of New York City, of counsel), for plaintiffs.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Henry N. Paul and Henry N. Paul, Jr., both of Philadelphia, Pa., and Ray Rood Allen, of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My decision in this case is that the bill of complaint be dismissed, with costs, on the ground that the claims on which it is founded are invalid for want of invention.

I. This cause is based on the following claims of three hitherto unadjudicated patents: Claims 12 to 22, inclusive, of reissue patent No. Re. 16,073, claim 6 of United States patent No. 1,564,285, and claim 9, of United States patent No. 1,650,661.

There is not any question herein either of jurisdiction or of venue. The incorporation of the parties and the locus standi of the plaintiffs is not challenged, for by operation of valid assignments from the estate of the original patentee, Alfred H. Smith, the Less Car Load Lots Company, a corporation of Delaware, is now the owner of said patents, and the L. C. L. Corporation, a corporation of New York, is the sole licensee under the patents from said owner.

The only consideration involved herein is the question of the validity of the patents, for there is not any question but that if the patents are valid they were in some instances infringed by the defendant.

II. On June 9, 1920, Mr. Alfred H. Smith, then president of the New York Central Railroad Company, filed two applications for patents; one was given the serial number 387,517, and the other was given the serial number 387,518. Application No. 387,517 was granted on February 21, 1922, as United States patent No. 1,407,593, and application No. 387,518 was granted as United States patent No. 1,564,285, on December 8, 1925.

On December 21, 1921, Mr. Smith filed an application which was given the serial number 524,031, and which eventually resulted in the granting to him of United States patent No. 1,650,661, on November 29, 1927.

On February 21, 1924, the second anniversary of the granting of United States patent No. 1,407,593, Mr. Smith filed an application under the serial number 694,438 for a reissue of that patent. The reissue was granted as Re. 16,073 on May 19, 1925.

III. A. The relevant parts of the specification of the reissue patent, Re. 16,073, which superseded the original patent No. 1,407,593, is stated to be, as the original patent was, for "new and useful Improvements in Compartment Freight Cars," as follows:

"In the system now in vogue in handling freight and express matter it is necessary for the shipper, in many instances, to crate his goods then haul them to the station to a receiving platform from whence it is loaded onto the car and this series of operations is repeated after the goods reach the destination city. In the case of a shipment of merchandise, etc., the manufacturer must construct packing cases which involves a material expense.

"In the billing of less than carload lots of merchandise for shipment, each box and package must be itemized and counted. By this invention, the lading would be placed in the compartment at shipper's load and count, would be sealed and locked and the compartment would be handled intact; the 'way billing' will be reduced to a minimum; the reciting in detail of what the compartment contains will be eliminated. On some railroads, 80% of the billing is composed of these small items, and the checking of such takes time, involves expense and involves a great amount of labor. * * *

"As regards the burglary of cars and the loss and damage of freight: This mostly occurs between the time when the shipment is delivered to the freight house at the point of origin and the time it is delivered to the freight house at destination, for the reason that the average shipment passes through a large number of hands, is liable to breakage and gives opportunity for removing a portion of the merchandise.

"In many instances cars are broken into while standing in yards and also while the trains are in motion, the packages being thrown out along the road and removed by confederates.

"A great deal of damage also occurs by reason of rough handling in freight houses by careless employees or because the container is of insufficient strength. Also the constant re-handling of packages is responsible for breakage or partly destroyed goods.

"It should also be taken into account that in addition to the actual loss and damage, there is a considerable loss to the public by reason of the fact that what they have purchased and shipped fails to arrive, or upon

arrival, is in a damaged condition. This delays sales, and, in the case of castings and similar building material, delays construction, results in great inconvenience and loss of money so that the actual loss and damage, while it can be measured in terms of money, cannot be measured as to actual loss because of its importance at a given time. Furthermore with this invention shipments will not be so much exposed to the elements. * * *

"One of the objects of my invention is to provide individual freight or merchandise compartment to shippers at the factory or stores into which their goods may be placed without being previously crated and the compartments loaded and placed upon a dray from which it is lifted onto a car or platform at the railroad station there being a plurality of these compartments for each car so that the individual compartments may be lifted bodily with its contents from the car at the point of destination and placed upon a truck to be delivered to the consignee at the store or factory who will unpack the compartment and have it returned to the railroad. By this system it will be seen that a number of handlings of freight merchandise, parcel post and express matter is eliminated thereby cutting down the cost besides which the lading is thoroughly protected from the inclemencies of the weather while in transit and thoroughly protected against theft.

"Another object of this invention is to place a plurality of these compartments on a single car, in juxtaposition, with the door of one compartment facing a wall of the next adjacent compartment or an abutment whereby the doors are held in closed position while en route. The doors being adjacent the walls of the next compartment cannot be opened while the compartments are in transit on the railroad. * * *

"While I have, for the purpose of describing and illustrating my invention, shown a specific form of compartment and arrangement of car to receive the compartments it will be understood that my invention is not limited to such specific constructions but on the contrary is generic to the broad idea of providing a compartment which may be loaded by the shipper, placed upon a car adapted to receive it and removed from said car and delivered to the consignee with the shipment intact, and the loading of a series of such compartments on a car with the doors of such compartments adjacent a wall of another compartment, or an abutment which prevents the opening of the door while the compartment is in position on the car. It is also obvious that the underframe of the car may be of skeleton form."

The claims of Re. 16,073 on which the cause is founded, in so far as that patent is concerned, are the following:

"12. In combination, a plurality of portable containers, a support therefor, a door in each of said containers, and means associated with said support adapted to cause said doors to become automatically locked when the containers are deposited on the support.

"13. In combination, a substantially rectangular support, a plurality of containers positioned side by side therein, a door in one of the vertical walls of each container, and a member projecting above the floor of the support for locking the door when the container stands on the support.

"14. In combination, a substantially rectangular support, containers positioned side by side and resting on the floor of said support, a door in each of said containers, and means projecting above the floor of the support and abutting some of the walls of the containers for automatically locking the doors when the containers are deposited on the support.

"15. In combination, a support, containers positioned side by side thereon, a door in each container, and a member carried by the support and extending above the bottom of each door, whereby each door is locked against surreptitious opening when the container is placed on the support.

"16. In combination, a holder, a plurality of containers thereon, a door in each of said containers, and a wall projecting upwardly from the floor of the holder and around the marginal edges thereof, said wall being in close fitting engagement with the containers whereby each door is locked against surreptitious opening, as soon as the container is deposited on the holder.

"17. In combination, a substantially rectangular support, a plurality of containers positioned side by side on the floor of said support, a door in each of said containers, and a member extending entirely around the support and projecting upwardly therefrom, the top edges of said member being above the bottom of said doors, whereby the door is locked so long as the container remains on the support.

"18. In combination, a substantially rectangular holder, a plurality of containers positioned thereon, each of said containers having at least one door extending vertically of the container, and a wall extending around the holder and projecting vertically above the floor thereof, said wall being in close fitting engagement with at least two walls of the container, whereby the doors are automatically locked when the containers are deposited on the holder.

"19. In combination, a rectangular support, a plurality of containers positioned side by side within said support, each container having a door transversely of the support, and means whereby said doors are locked, partially by the wall of an adjacent container, and partially by the support.

"20. In combination, a substantially rectangular support, a plurality of containers positioned side by side thereon, each container having a door extending transversely of the support, and means carried by the support and extending upwardly from the floor thereof, said means having a portion thereof above the bottom of said door, whereby the doors are locked as long as the container remains on the support.

"21. The combination, with a support, of a plurality of rectangular six-sided containers adapted to rest thereon, each container having vertical walls and a door in one of said walls, and means for holding the containers on the support in such manner that the doors are automatically locked so long as the containers remain in position.

"22. The combination, with a support, of a plurality of rectangular six-sided containers adapted to rest thereon, each container having vertical walls and a door in one of said walls, and means for holding the containers on the support, each door being then blocked by means in front thereof preventing its being opened."

B. The relevant parts of the specification of United States patent No. 1,564,285, which is also stated to be, as the original patent No. 1,407,593 was, for "new and useful Improvements in Compartment Freight Cars," are as follows:

"In the handling of freight and express matter railroads are subjected to very serious financial losses due to theft of freight and express matter. Various expedients have been adopted and used to prevent or minimize such losses due to theft, but thus far no satisfactory expedient has been produced.

"Another source of loss to the railroads has been the placing of freight on platforms where it is necessarily exposed to the elements and also to theft.

"The object of my invention is to provide a series of independent freight and express holding compartments which may be loaded at the factory of the consignor and loaded on a railroad car where it remains undisturbed until it reaches its point of destination, and if the point of destination does not have a suitable housing for freight the compartment can be set intact and locked on the platform and function in that position as a freight warehouse protecting the goods from the elements and theft. It is contemplated to place a plurality of these compartments on a single car with the door of one compartment adjacent to the wall of the next adjacent compartment whereby only the imperforate walls of the compartment are exposed when the compartments are in position on the car."

The claim of United States patent No. 1,564,285, on which the cause is founded, in so far as that patent is concerned, is the following: "6. In a transportation unit, a pair of shipping containers, one side wall of each of said containers being equipped with doors, said containers being secured in position in said unit with door equipped walls contiguous to each other."

C. The relevant parts of the specification of United States patent No. 1,650,661, which is also for a Compartment Freight Car, are as follows: "My invention consists of a carrier having bulkheads extending vertically from the platform of the carrier, containers having doors, and loaded on said carrier with the doors adjacent to said bulkheads, whereby the door cannot be opened while the container is on the carrier; and spacing elements and abutments on the carrier and containers preventing the containers from rocking and shifting relative to each other and to the carrier."

The claim of United States patent No. 1,650,661, on which the cause is founded, in so far as that patent is concerned, is the following: "9. In combination, a substantially rectangular support, a plurality of containers, each having a length approximately equal to the width of the support, said containers being positioned side by side on the floor of said support, a door in the end of each of said containers, and a longitudinal upstanding flange at the edge of said support, the top edges of said flange lying above the bottom of said doors, whereby the

doors are locked so long as the container remains on the support."

IV. It will be seen from these quotations from the specifications of these three patents, and of the claims thereof on which the cause is based, that what Mr. Smith considered his invention was the use in combination of a series of six-sided containers with doors in each thereof, instead of the old box freight car, and the placing of these containers in such a position towards each other or towards the sides of a gondola car as would block the doors to the compartment.

This combination of a gondola car with these containers is said to have achieved, in a very simple manner, two objectives: (1) It gives greater plasticity to railroads handling goods in less than carload lots because the containers can be transferred on motortrucks to the railway terminal of shipment from the consignor's place of business and from the railway terminal of delivery to the consignee's place of business, and can be easily redistributed for rerouting purposes during transportation; and (2) it increases safety of the goods from theft in transit because by reason of the position in which the containers are put in regard to each other, or in regard to the sides of gondola cars, the doors are so blocked as to reduce the danger of theft to a minimum.

V. The reissue patent Re. 16,073, it is contended by the plaintiffs' counsel, is a basic patent and covers every conceivable manner of putting containers on a gondola car so that their doors will be blocked.

The second patent in suit, United States patent No. 1,564,285, is concededly a limited patent covering the placing of containers on a gondola car so as to have one door of a container block a corresponding door in the next container.

The third patent in suit, United States patent No. 1,650,661, is also concededly a limited patent for putting containers on gondola cars with their doors so placed that the side wall of the gondola car blocks those doors.

It is admitted that at the time when Mr. Smith's first application was made both gondola cars and containers of substantially the form which he represents in his drawings and specifications were old in the railroad goods transportation art.

The defendant denies invention, and pleads that the so-called combination is a mere aggregation.

The question to be determined here is whether their assembly in the manner claimed in the patents here involved constituted a combination involving any inventive process on Mr. Smith's part or not.

The question of invention rather than of anticipation is, I think, the first question to decide when the validity of any patent is in question. This order of consideration seems to be implicit in the manner in which the Supreme Court dealt with two patents recently before it. Cf. Carbice Corporation v. American Patents Company, 283 U. S. 420, 421, 422, 51 S. Ct. 496, 75 L. Ed. 1153; De Forest Radio Company v. General Electric Company, 283 U. S. 664, 685, 686, 51 S. Ct. 563, 75 L. Ed. 1339.

It is necessary, therefore, to examine the state of the prior art in order to determine whether the patents which were granted to Mr. Smith can properly be said to have involved invention.

VI. A. In 1845 a patent was granted in Great Britain to one Henry Buckworth Powell, British patent No. 10,957, for "Certain Improvements in Carriages to be used on Rail and Other Roads," with the proviso that Mr. Powell should cause a particular description of the nature of his invention and the manner in which it was to be performed to be filed within six calendar months in the Chancery Court. Within the prescribed period, Mr. Powell filed his specification and drawings, and he described his invention on page 2 of his specification as follows:

"My Invention relates to the construction of passenger carriages to be used on railroads, and to the construction of luggage waggons to be used on rail and other roads. I effect these improvements by constructing the bodies of the carriages or waggons quite separate and moveable from the carriage beds or trucks thereof, so as to enable them to be shifted or changed at pleasure from the broad-guage carriage bed to the narrow-guage carriage bed, or from the narrow-guage carriage bed to the broad-guage carriage bed, as may be required, and thereby enabling the bodies of such carriages or waggons, when filled or loaded, to be transferred from a railway carriage of one gauge to that of another guage without removing the passengers or unpacking the goods. This will obviate the difficulty, delay, and inconvenience experienced at present from the removal of passengers and unpacking of goods, which must take place as railway carriages are at present con-

structed, where passengers and goods have to be transferred from one railroad to another of a different guage.

"And my Invention relates also to the construction of waggons for luggage to be used on common roads, to enable such waggons to be loaded with goods or luggage at a warehouse, store, or other place at any distance from the line of railway, thence to be drawn to the railway, where it will be requisite only to slide the bodies of such waggons from their carriages on to the railway carriages, thereby enabling merchants to send merchandise to be conveyed by railways without such merchandise being unpacked until it has arrived at its final destination. But in order that my Invention may be better understood and readily carried into effect, I will proceed to describe the Drawings hereunto annexed."

His drawings disclose a typical English goods truck with three separate containers set side by side thereon and so fastened to each other by latches as to tend to stabilize them in their position on the truck. The railway trucks did not have any raised edge which would block the doors; the raised edge constituted a piece of timber firmly secured on the sides and ends of the truck and prevented the containers from sliding off the railway trucks either sideways, forward or backward, but they showed separate containers which could be put on and off the railway trucks which bore them from place to place, and could also be carried by waggons from a consignor to the railway terminal of shipment and from the railway terminal of delivery to the consignee.

Whilst Mr. Powell seems in his patent to have been in large part occupied in dealing with the method of transferring the containers from one railway truck to another, or from the railway truck to an ordinary wagon, by means of rollers, etc., it seems to me that the whole principle which Mr. Smith specified in his patent was shown in the Powell patent, and that the application of what Powell teaches to present railway conditions could not be considered an act of invention by Mr. Smith.

B. Many years later, April 31, 1880, there was an Italian patent granted to one Michele Albertazzi as an improvement to the Italian patent No. 11,365 which had been granted to Albertazzi, on November 13, 1879. Albertazzi's patent was for "Divisible and Aggregative Freight cars with Rails." His description of this improve-ment in his patent as shown in the agreed translation thereof is as follows:

"To promote the use of divisible and aggregative cars, beyond the application of rails to trains which facilitate in special manner the unloading of the containers or cages from divisible cars or wagons, there is applied the arrangement shown in the drawing which forms the object of the present improvement patent. This arrangement consists in adding hooks or eyes to the structure of the containers of the divisible wagons to effect unloading of the same by the crane or winch on trains not provided with rails, whether or not the containers are provided with corresponding wheels, whereby the wagons or cars combine the utilities of those having rails and those without rails.

"The containers of the divisible wagons also serve in unloading without the necessity of removing the goods from the same, for joint service with foreign railways having gauge different from our standard gauge such as the Russian and Spanish lines, etc., but which have the useful space for the containers of the wagons, or have wagons of dimensions nearly equal to ours.

"The division of the wagons is obtained as already set forth in the main specification, by constructing the cage or container separately from the under structure or train, dividing the container into as many parts and dimensions according to the nature of the goods and of the service to be given."

C. As above noted, the application for Mr. Smith's first patent was filed June 9, 1920, and given serial number 387,517, and eventuated on February 21, 1922, in United States patent No. 1,407,593; the original of reissue patent Re. 16,073.

On March 22, 1917, before Mr. Smith's first application, Henry W. Kirchner, of St. Louis, Mo., filed an application for an "Interchangeable-Unit Car," which was given the serial number 156,581, and eventuated on November 30, 1920, in United States patent No. 1,360,412.

This application by Mr. Kirchner may, on the issue of invention, properly be considered as in the prior art. Milburn Company v. Davis-Bournonville Company, 270 U. S. 390, 401, 402, 46 S. Ct. 324, 70 L. Ed. 651; Naceskid Service Chain Company v. Perdue (C. C. A. 6) 1 F.(2d) 924, 925; Lemley v. Dobson-Evans Company (C. C. A. 6) 243 F. 391, 395, 397; Hazeltine Corpora-

tion v. Radio Corporation of America (D. C.) 52 F.(2d) 504, 509; Yale Hook & Eye Company v. Interwoven Hook & Eye Company (D. C.) 33 F.(2d) 295, 297, 298.

Mr. Kirchner's specification is as follows:

"This invention relates to railway cars, and specifically to certain improvements in cars of the type known as interchangeable unit cars which are characterized by the employment of a special underframe construction arranged for the reception of specially formed containers or units in which the cargo is carried. It is the intention that the units or containers so employed be individually movable and interchangeable on the underframe and among different similar cars.

"The present application is directed to a special form of car construction whose particular object is to facilitate the handling of the units or containers by making special provision for the loading and unloading thereof by means of trucks or transveyors.

"Further objects are to provide a special and improved form of container designed for this special use, and to provide also an improved form of securing or attaching means for retaining the containers upon the underframe."

Furthermore, it is common ground between the parties that in this country as early as 1849 separate six-sided containers had been used for the carriage of goods on a railroad known as the Camden-Amboy Railway, now part of the Pennsylvania System.

Six-sided goods containers with doors in them are not patented. Any one can make and sell and use them.

In June, 1920, when Mr. Smith's first application was filed, there were thousands of gondola cars on the railways of the United States; indeed, on the defendant's system alone there were upwards of 70,000.

Just as the containers and the gondola cars were old, so was the knowledge that a door could be blocked by a wall, for since history began men have been aware that a wall immediately outside a door would prevent it from opening outwards.

B. If the patents herein, which teach merely the use of well-known unpatented articles in ordinary positions, were to be held valid, it would soon be found that the plaintiffs herein could exact a royalty not only from railways, but from any independent owner of a motortruck with sides who transferred one of the containers we have been discussing to or from a railway terminal, or who carried such containers from one city to another. Indeed, looking at the matter more broadly, it seems to me that if patents of such a kind as are here involved are issued by the Patent Office and upheld by the courts, soon almost everything in life will be subject to a claim for royalty, and a man's use of his own property will be seriously hampered.

Progress occurs in the useful arts through the operation of two processes: evolution and invention.

Every useful art has its technique which is practiced by those who are skilled in it, and which is broadened in its usefulness thereto from precedent to precedent. This is the process of evolution, a phenomenon in which the expectable follows the expectable.

Invention is the antithesis of evolution, and connotes necessarily the achievement of the unexpectable. It may properly be said to occur only when a demand for an advance in an art has built up a sufficient potential to cause the spark of some man's thought, by jumping an uncrossed gap between an outpost of that art and one of its desiderata, to give the world something new in process, product, or device.

Because each of the various articles specified to be assembled in the Smith patents performed only its own function in an old way, those patents did not constitute a patentable combination within the classic definition thereof laid down in Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L. Ed. 241, but as that case was decided on the ground that there was not any infringement by the defendant, apter citations to support my decision in the present case are Pennsylvania Railroad v. Locomotive Truck Company, 110 U. S. 490, 494, 4 S. Ct. 220, 28 L. Ed. 222; Carbice Corporation v. American Patents Company, 283 U. S. 420, 422, 51 S. Ct. 496, 75 L. Ed. 1153.

What Mr. Smith did in 1920 when he devised his compartment freight cars with their appendages was done as the response of an astute and experienced railway man to the competition then existing between railroads for goods to carry. It is a quite typical instance, I think, of the process of evolution at work in a useful art.

VII. Owing to my opinion that the claims of the three Smith patents in suit are invalid for lack of invention, it becomes

quite unnecessary, I am happy to say, for me to get involved in the question of the scope of the claims in the reissue patent or the numerous file wrappers which have been submitted to me covering the series of proceedings in the Patent Office involving these patent and United States patent No. 1,583,319 not in suit; nor do I have to deal with the question of alleged laches in the application for the reissue of United States patent No. 1,407,593.

VIII. An order may be entered making the above opinion the findings of fact and conclusions of law herein and such an order may be either submitted to me separately or may be included in the final decree dismissing the complaint with costs.

Settle order and decree on notice.